UNITED STATES of America

v.

Irving KAHN and Teleprompter Corp., Defendants.

No. 71 CR. 1048.

United States District Court, S. D. New York.

June 16, 1972.

Whitney North Seymour, Jr., U. S. Atty., for plaintiff; by John D. Gordan, III, New York City, of counsel.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant Kahn; Peter Fleming, Jr., John E. Sprizzo, James P. Lavin, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendant Teleprompter; Robert B. Fiske, Jr., Dale L. Matschullat, New York City, of counsel.

MOTLEY, District Judge.

*Opinion on Second Motion for New Trial*

Defendants Irving Kahn and Teleprompter Corporation were found guilty, after trial by jury, of three counts charging violation of 18 U.S.C. § 1952 (The Travel Act) and one count of conspiring to do so. 18 U.S.C. § 371. Succinctly, the charges were that defendants conspired with three officials of the City of Johnstown, Pennsylvania to travel in interstate commerce and use the mails and did so to promote the crime of bribery in violation of the laws of Pennsylvania in connection with the awarding of an exclusive Cable TV franchise to Teleprompter by the City of Johnstown. The three officials were indicted on these charges along with Kahn and Teleprompter.

Mayor Kenneth O. Tompkins and J. Howard Deardorff, two of the city officials to whom the money had been paid, pleaded guilty and testified for the Government. In essence, they testified that Kahn offered first a total of $5,000, but they asked him for $5,000 each which he agreed to pay in the manner described over a period of time. The son of one of the testifying officials, Kenneth O. Tompkins, II, testified that he received the first payment of $7,500 from Kahn in New York City and mailed the same to his father in Johnstown. The balance, as the evidence disclosed, was paid by two separate checks. One check was picked up from Kahn in New York by Mayor Tompkins. The other check was mailed by a Teleprompter employee from New York to Johnstown.

Defendants did not deny that they paid $15,000 to three Johnstown officials in connection with the awarding to Teleprompter of an exclusive Cable TV franchise or that interstate travel and use of the mails were involved in the payment. Their defense was that the $15,000 had been extorted from Kahn and Teleprompter by the three officials who threatened to cancel a validly existing franchise which Teleprompter already owned from the City of Johnstown. Kahn and Teleprompter were convicted by the jury of conspiracy and the three Travel Act counts. In addition, defendant Kahn was found guilty of perjury. 18 U.S.C. § 1621.

Thereafter, both defendants filed motions for judgment of acquittal and, in the alternative, for a new trial. The motions were denied in an opinion and order of this court on December 16, 1971, 340 F.Supp. 485. Both defendants duly filed notices of appeal. However, before the appeals could be heard defendants moved in the Court of Appeals for an order remanding the case to this court for the purpose of making the instant motions for a new trial based upon newly discovered evidence. The motion to remand was granted. Rule 33, Fed. R.Crim.P. Defendants Kahn and Teleprompter now move for a new trial on the ground of newly discovered evidence resulting from the trial of co-defendant Robert McKee whose trial occurred subsequent to the trial of Kahn and Teleprompter.

As set forth above, the three city officials who accepted the $15,000 payment from Kahn and Teleprompter were also named as defendants. The officials were all members of the Johnstown City Council which had the authority to award an exclusive Cable TV franchise in Johnstown in 1966. Robert McKee was one of the three city officials who also had been indicted. McKee and an-

**1134**

other councilman and co-defendant, J. Howard Deardorff, were originally represented by the same lawyer. The third councilman, Kenneth O. Tompkins, Sr., represented by different counsel, was also the Mayor of Johnstown. When the case came on for trial in October, 1971, McKee's attorney, who also represented Deardorff, advised the court that he believed there was a conflict of interest between himself and McKee since Deardorff intended to plead guilty to the crimes charged and to testify for the Government. The court thereupon severed the trial of McKee and permitted him to obtain new counsel. His case came on for trial in January, 1972.

McKee's defense was that he accepted the money but believed it to be a campaign contribution and spent the money for this purpose. He also claimed that he had no knowledge as to how the money had been paid and therefore did not know that any interstate travel or use of the mails was involved. He was found guilty on all counts except the fourth count involving the mailing of the second check by a Teleprompter employee from New York to Mayor Tompkins in Johnstown. An appeal was taken by McKee from his conviction, which was affirmed by the Court of Appeals on June 7, 1972.

Kahn and Teleprompter now claim that from the McKee trial arises the following newly discovered evidence warranting a new trial of their case:

1) Warren Reitz, Sr., a Johnstown businessman interested in securing the exclusive Cable TV franchise, testified at the McKee trial concerning a conversation he had with McKee on February 1, 1966. Reitz did not testify at the Kahn-Teleprompter trial. He testified, in essence, on the McKee trial that on February 1, 1966, he appeared at a meeting of the City Council of Johnstown at which bidding on a cable TV franchise was to take place. He testified further that before the meeting McKee walked by him and commented as follows: "Warren, this is not the way to

do this. You should have seen me before."

Defendants claim that this Reitz testimony would have been helpful to them on five grounds: First, it proves that contrary to the Government's contention McKee had not been previously bribed by Kahn on January 24, 1966. Second, it proves that McKee was personally corrupt and amenable to a bribe. Third, it supports Kahn's contention that Mayor Tompkins, once he decided to characterize the $15,000 payment as a bribe and not as extortion, was in a position to coerce similar testimony from McKee and Deardorff by reason of Tompkins' knowledge of other corruption by McKee and Deardorff. Fourth, it provided an additional basis for the receipt into evidence of defendants' offer of Councilman Malinowski's testimony that one week before the trial Mayor Tompkins declared, "I'll tell you one thing, if I'm going to go down, everybody is going to go down with me." Fifth, "it might well have allowed Mr. Kahn to call McKee as a witness." (Kahn brief, p. 8.)

Kahn claims that the Reitz evidence, known to the Government as early as June 1971, was deliberately suppressed by it in the sense that the value of the evidence to the defense could not have escaped the prosecution and that this suppression of evidence, ipso facto, warrants a new trial. United States v. Polisi, 416 F.2d 573 (2d Cir. 1969).

Alternatively, defendants claim that without regard to the suppression question, a new trial is in order because 1) this evidence was discovered after their trial, 2) it was material to the factual issues at their trial and not merely cumulative of evidence already introduced or impeaching the character or credit of a witness, and 3) it is of such a nature that it would probably produce a different verdict in the event of a retrial. United States v. Polisi, *supra.*

2) Mayor Tompkins testified at the McKee trial contrary to his testimony at the Kahn-Teleprompter trial that he had asked Kahn for cash on January 24, 1966. As to this conflict, defendants

say Tompkins' admission at the McKee trial that he asked for cash was very material to the factual issues on their trial since it is tantamount to an admission that Mayor Tompkins extorted Kahn. This testimony, alone, defendants claim might produce a different result at a retrial. United States v. Polisi, *supra*.

Defendant Kahn goes further, however, and asks for a hearing to determine whether the Government knew that Mayor Tompkins was not telling the truth when he testified on the Kahn-Teleprompter trial that he had not asked Kahn for cash. He then claims, of course, that if it can be proved that the prosecution knew that Tompkins was testifying falsely at defendants' trial, the prosecution's failure to correct the perjury would require a new trial without more. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); United States v. Polisi, *supra*, Kyle v. United States, 297 F.2d 507 (2d Cir. 1961).

3) Defendants claim that Deardorff changed his testimony at the McKee trial on the crucial question of what occurred at the Holiday Inn in Johnstown on January 24, 1966 when Kahn and the three city officials met to discuss the awarding of the franchise to Teleprompter and the payment of money. Defendants say that Deardorff testified at their trial that Kahn and the three officials had gone into the bathroom in Kahn's Holiday Inn room together where Kahn offered $15,000 to the three men in a group. Whereas at the McKee trial Deardorff testified that Kahn took him, Deardorff, aside first and asked him if a $15,000 payment would secure the votes of Tompkins, McKee, and Deardorff. Deardorff then spoke to Tompkins and McKee and reported Kahn's offer to them, which was accepted. Deardorff then called Kahn to join the group where Kahn was advised of the acceptance.

Kahn claims that if the prosecutor knew that Deardorff's testimony at Kahn's trial was perjurious in this respect, then the prosecutor was under an obligation to correct that testimony and his failure to do so requires a new trial. Napue v. Illinois, *supra*. However, Kahn claims that a hearing is required to determine whether the prosecutor knew of this alleged perjury.

In any event, says Kahn, a new trial is required even under the "less demanding" standard applicable to motions based upon newly discovered evidence where there has been no prosecutorial misconduct. What happened on January 24, says Kahn, was the basic question of fact at the Kahn-Teleprompter trial, therefore Deardorff's changed version supports Kahn's claim that Deardorff testified to bribery as a result of Tompkins' coercion.

4) Defendants next claim that during the Kahn-Teleprompter trial, Mayor Tompkins and Deardorff denied having discussed their and McKee's dealings with Kahn among themselves during the grand jury investigation and prior to their actually testifying before the grand jury. During the McKee trial, however, Tompkins, Deardorff and McKee testified to having discussed their predicament on a number of occasions during the period in question.

This latter testimony was crucial, defendants claim, because it was evidence that the three officials had an opportunity to collaborate on a fabricated story of bribery and such evidence, added to all the other items, might have caused the jury to disbelieve Tompkins and Deardorff. Again, Kahn goes further and asks for an evidentiary hearing as to whether the prosecutor knew that at the Kahn-Teleprompter trial Tompkins and Deardorff perjured themselves when they testified as they did.

5) During the McKee trial Mayor Tompkins' son testified that he was employed at that time as an attorney for the Commonwealth of Pennsylvania and became so employed shortly after the Kahn-Teleprompter trial. Tompkins' son was a Government witness at the Kahn-Teleprompter trial.

Kahn now claims that it would have been material to his defense "that Tompkins II and Mayor Tompkins had been promised that the Government, in return for *their* cooperation, would not bring Tompkins II's admitted perjury and bribery to the attention of the State of Pennsylvania and would not otherwise attempt to block Tompkins II's employment as an attorney." However, Kahn goes on to say: "We cannot allege that the prosecution's failure to disclose such a promise was material since we cannot allege that such a promise was made." (Kahn Brief, p. 12.) If such a promise was made, Kahn says, the prosecutor's duty to disclose this at the Kahn-Teleprompter trial was clear. He then says that this evidence could have been used to show that Mayor Tompkins had a motive for characterizing the payment as a bribe rather than extortion. It was the Government's belief that Kahn offered a bribe and that he was not extorted by the City officials. Consequently, to please the Government, Kahn says, Mayor Tompkins testified that the payment was a bribe.

6) During the McKee trial the Government revealed that McKee had been interviewed regarding his personal finances in June, 1971, by Special F.B.I. Agent Doonan. McKee told Doonan, among other things, that he rented a safe deposit box in which he had $10,000 cash and that he also had $5,000 cash in his house which he used to purchase a home.

This non-disclosure, says Kahn, was deliberate in that its value to the defense in the Kahn-Teleprompter trial could not have escaped the prosecution. It was also material since it provided strong evidence that the City officials of Johnstown were practiced in corruption, as Kahn had contended, and supported his claim that he had been extorted by these officials.

In its opposing affidavit the Government's counsel who prepared the Kahn-Teleprompter Case and the McKee Case and participated in both trials replied as follows:

1) During the course of preparing the Kahn-Teleprompter trial two memoranda written by Special Investigator Doonan came to my attention—one referred to an interview with Warren Reitz, Sr., the other to an interview with McKee.

2) To the best of his recollection, he never apprised the Government's chief counsel in the Kahn-Teleprompter trial of the existence of these memoranda or their contents.

3) At no time during the preparation of the Kahn-Teleprompter trial did it ever occur to him that the two memoranda would be of assistance to either Kahn or Teleprompter.

4) No United States Attorney to his knowledge, including himself, was aware or believed Mayor Tompkins to be testifying falsely at the Kahn-Teleprompter trial when he testified that he had never asked Kahn for cash.

5) At the time of the Kahn-Teleprompter trial neither he nor any other Government attorney, to his knowledge, knew of the future employment plans of Mayor Tompkins' son and no Government attorney, to his knowledge, ever made any promise to the son with respect to future employment and his role in the crimes charged in the indictment.

In its answering brief the Government contends that 1) Deardorff's testimony as to what occurred at the Holiday Inn on January 24, 1966 was substantially the same at both trials, and 2) the testimony of Tompkins and Deardorff regarding their discussions of the case during the grand jury proceedings and prior to their testimony was also the same on both trials.

The instant motions for new trial based upon newly discovered evidence are thus two-pronged. First it is claimed by Kahn that there was prosecutorial misconduct. He claims that the prosecution suppressed the Reitz evidence[*] and the McKee statement about his finances in the sense that the value of this evidence to the defense could not have escaped the prosecution. He does not claim or allege that the prosecution

knew that Mayor Tompkins and Councilman Deardorff were testifying falsely on the Kahn-Teleprompter trial and failed to make the correction. Kahn's claim is that he is entitled to a hearing to determine whether the Government knew of this perjury. Second, it is claimed by both defendants that, aside from any question of prosecutorial misconduct, all of the newly discovered evidence was material to the factual issues on their trial and is of such a nature that the jury might reach a different result upon a new trial.

In Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court reiterated its prior holdings regarding prosecutorial misconduct requiring a new trial. There the Court said:

> "As long ago as Mooney v. Holohan, 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791] (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' This was reaffirmed in Pyle v. Kansas, 317 U.S. 213 [63 S.Ct. 177, 87 L.Ed. 214] (1942). In Napue v. Illinois, 360 U.S. 264 [79 S.Ct. 1173, 3 L.Ed.2d 1217] (1959), we said, "the same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*, at 269 [79 S.Ct. 1173]. Thereafter Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1962), held that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution.' See ABA, Standards Relating to the Prosecution Function and the Defense Function, § 3.11(a). When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule. *Napue, supra*, [360 U.S.] at 269 [79 S.Ct. 1173]. We do not, however, automatically require a new trial whenever 'the combing of the prosecutor's files after

the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . . ' United States v. Keogh, 391 F.2d 138, 148 (C.A.2 1968). A finding of materiality of the evidence is required under *Brady, supra*, [373 U.S.], at 87 [83 S.Ct. 1194]. A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .' Napue v. Illinois, *supra*, [360 U.S.], at 271 [79 S.Ct. 1173]."

In United States v. DeSapio, 456 F.2d 644 (2d Cir., 1972), the Second Circuit Court of Appeals restated its previously enunciated criteria for determining when a new trial should be granted. The Court said:

> "The generally accepted criteria for granting a new trial on the ground of newly discovered evidence are (1) the evidence must have been discovered since the trial, (2) it must be material to the factual issues at the trial and not merely cumulative of evidence already introduced or impeaching the character or credit of a witness, and (3) it must be of such a nature that it would probably produce a different verdict in the event of a retrial. United States v. Polisi, 416 F.2d 573, 576–577 (2d Cir. 1969)." (Emphasis omitted.)

In United States v. Polisi, *supra*, at p. 577, the Second Circuit also ruled that:

> "Where the conviction is shown to be based even in part upon perjured testimony, however, a court will not stop to inquire as to the precise effect of the perjury, but will order a new trial *if without the perjury the jury might not have convicted.*" (Emphasis added.)

It went on to say:

> "Similarly, the general rule does not apply where the prosecutor has suppressed evidence . . . otherwise favorable to the accused. . . . A prosecutor's failure to disclose evidence whose high value to the defense

could not have escaped him requires a new trial, even where the perjury concerns only the credibility of the witness and not the facts at issue.
. . .

\* \* \* \* \* \*

"A new trial is required where the prosecutor's failure to disclose was a considered decision for the sake of obstruction, or where the value of the evidence to the accused could not have escaped him. (at 577)."

Then the Court went on to discuss the criteria applicable to cases where there is not deliberate non-disclosure on the part of the prosecution. It said,

"Where the non-disclosure is passive, i. e. not deliberate in the above senses, the courts have sometimes modified the criteria for a new trial, and instead looked to the defendant's harm, i. e. prejudice. The earlier decisions of this court have reasoned that where what is at stake is not deterrence of conduct detrimental to the integrity of the judicial system, the strong policy underlying the desired finalty of judgments comes into play and requires a substantially higher probability that disclosure of the evidence to the defense would have altered the result." . . . (at 577).

In this connection the decision of the Second Circuit in United States v. Keogh, 391 F.2d 138 (1968), cited by the Supreme Court in Giglio v. United States, *supra*, is applicable. There the Court said:

"There remains a third category of cases—where the suppression was not deliberate in either of the senses we have included and no request was made, but where hindsight discloses that the defense could have put the evidence to not insignificant use. While we do not dispute that relief may sometimes be granted even in such cases, the standard of materiality must be considerably higher. . . . To invalidate convictions in such cases because a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict would create unbearable burdens and uncertainties." (391 F.2d at 147–148).

Applying the foregoing standards to the instant case, it is clear that the present motions for a new trial must be denied.

The memoranda relating to the Reitz testimony and McKee's finances were admittedly in the Government's files at the time of the Kahn-Teleprompter trial. To say that the value of these memoranda to the defense could not have escaped the prosecution is wholly without substance. Mayor Tompkins and Deardorff as witnesses for the Government could have been impeached with respect to their testimony that a bribe was offered and received as opposed to extortion on their part only by proof of prior misconduct *on their part* amounting to a conviction. United States v. De Sapio, *supra*, 456 F.2d 644; United States v. Glasser, 443 F.d 994, 1002–1003 (2d Cir. 1971). The Reitz evidence and the McKee statement were thus plainly inadmissible. McKee was not a Government witness on the Kahn-Teleprompter trial. He was a co-defendant who had pleaded not guilty and was awaiting trial. To suggest that he might have waived his Fifth Amendment right and testified under subpoena by Kahn as to his conversation with Reitz or his personal finances is plainly not tenable. These two memoranda therefore would not have been of any material use to defendants on their trial. In any event the Government's failure to turn these memoranda over to defense counsel plainly did not prejudice the defendants.

It is not alleged that Mayor Tompkins' testimony on the Kahn-Teleprompter trial that he never asked Kahn for cash, as opposed to his testimony on the McKee trial that he asked Kahn if he would pay the $15,000 in cash, is the result of perjury known to the prosecution at the time of the first trial. The same is true with respect to the testimony of Deardorff as to what occurred at the

Holiday Inn on January 24, 1966 and the testimony of all three officials as to their discussing the case during the grand jury proceedings and prior to their testimony before the grand jury. What is suggested by defendants is that since they have no such proof, an evidentiary hearing should be held to find out if there is such proof. "We see no reason to provide this relief and no precedent for it." United States v. De Sapio, *supra*, 456 F.2d p. 652.

This court finds that on the Kahn-Teleprompter trial Kahn's counsel was trying to establish that Mayor Tompkins extorted the payment which was made. In doing so he asked Mayor Tompkins whether it was not true that he demanded cash from Kahn at that time. It was in response to this line of questioning that Mayor Tompkins testified as follows:

"No, I never asked for cash because cash never entered my mind. *If I would have been extorting this man* I certainly would have asked for cash, but he was making the offer and he was working out the way of making the payment, and I never asked him for a dime's worth of cash because, in the first place, this is the first time I ever became involved in anything." (Emphasis added.)

On the McKee trial Mayor Tompkins had been interrupted in his testimony as to what occurred in the Holiday Inn by the Assistant United States Attorney as the record shows (at 83). He was then asked the following question:

"Q. Now, would you continue as to what was said concerning how this money was going to be paid. To the best of your recollection tell us who said what?"

Mayor Tompkins then tried to pick up from the point at which he had been interrupted and answered as follows:

"A. We talked about various things.

We talked about how the money was going to be paid, and I asked him if he would pay us the cash. He said, well, no, he couldn't do that."

Mayor Tompkins' statements about cash were therefore in two entirely different contexts. The first was in the context of whether he, Tompkins, was not engaged in extorting Kahn. The second was in the context of how the amount of money agreed upon was to be paid. It, therefore, cannot be said that any perjury has been clearly shown. But even assuming that on a new trial it is proved that Mayor Tompkins asked Kahn for cash the probability that the result would be different is nil.

Proof that Mayor Tompkins asked Kahn if he would pay cash is plainly not tantamount to an admission on Tompkins' part that he extorted Kahn. Mayor Tompkins' testimony is easily explained as indicated above. But the important facts are these: 1) Mayor Tompkins never denied that he asked Kahn to increase his original offer of $5,000 to $15,000 in exchange for the votes of all three councilmen, 2) the money was not paid in cash but over a period of time by three checks and via well planned subterfuges, thus dispelling any notion that the money paid had been the sole result of extortion by Tompkins, and 3) Kahn's extortion story did not emerge until his second appearance before the grand jury, thus making his claim of extortion truly incredible.

For the same reasons, the suggestion that a new trial is warranted because 1) Deardorff's testimony about what occurred in the Holiday Inn has been changed as indicated, and 2) it can be proved on a new trial that the three officials had an opportunity to discuss the case on several occasions during the grand jury investigation and before they actually testified, is not of sufficient weight to conclude that a different result might be obtained on a new trial. Deardorff testified substantially to the same effect on both trials as to what occurred at the Holiday Inn on January 24, 1966. (Kahn Tr. 521–522, McKee Tr. 238). At the Kahn-Teleprompter trial Deardorff testified that there

might have been some discussion of the case with the other city officials between the time that he received his grand jury subpoena and the time he testified (Kahn Tr. 530, 532–533). On the McKee trial Deardorff testified that he discussed the case after he received the subpoena (McKee Tr. 130–132, 245). As the Government points out, there is no inconsistency in this testimony since on the first trial the question was limited to the three-day period between subpoena and testimony whereas on the McKee trial it was not so limited.

Defendants' admittedly have no basis for their claim that it would be nice to know whether Tompkins II and Mayor Tompkins had received any promises with respect to Tompkins II's future employment and his involvement in the case in exchange for their cooperation.

For all of the foregoing reasons, the motions for new trial are denied.