**UNITED STATES of America, Plaintiff-Respondent,**

**v.**

**James Vincent KEOGH, Defendant-Petitioner.**

**No. 61 Cr. 1113.**

United States District Court, S. D. New York.

Aug. 5, 1970.

Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, New York City, for United States of America; J. Frank Cunningham, William T. Murphy, Attys., U. S. Department of Justice, Washington, D. C., of counsel.

Philip Handelman, New York City, for defendant-petitioner; Robert M. Trien, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is a second application for a writ of error coram nobis by James Vincent Keogh, who, together with Elliott Kahaner and Antonio Corallo, was convicted in June, 1962, after "a long trial with many witnesses and much documentary

evidence," [1] of conspiracy to obstruct the due administration of justice in a corrupt endeavor to influence a criminal proceeding in the United States District Court, Eastern District of New York. On direct appeal, the conviction was affirmed.[2] Petitioner's first coram nobis application in June, 1967, after service of his sentence and expiration of his parole, charged that the prosecution in numerous instances had knowingly suppressed exculpatory evidence and used perjured testimony upon the trial. It was denied without a hearing,[3] and the Court of Appeals affirmed in every respect save one, as to which it ordered an evidentiary hearing.[4] Following a hearing upon that single allegation of suppression of exculpatory evidence, which related to four bank deposits by Dr. Erdman, the government's principal witness, this court dismissed the writ once more in its entirety.[5] The Court of Appeals affirmed in all respects as to the four items, without prejudice to the filing of a new petition as to two new matters which petitioner sought to raise on appeal, but which had not been included in the original remand for an evidentiary hearing.[6] Petitioner, seven months thereafter, presented this petition for a writ of error coram nobis with respect to the items noted by the Court of Appeals. Familiarity is assumed with respect to the prior proceedings.

Petitioner alleges that the prosecution wrongfully withheld three FBI investigative reports—one concerning the finances of Dr. Erdman and his wife, and two concerning the Ace Manufacturing Company—which he contends contain exculpatory material, and that as a result he was denied his constitutionally guaranteed right to a fair trial. To put the matter in focus, it should be noted that the reports are not "exculpatory" in the sense that any material contained therein exonerates him of wrongdoing; rather, essentially the claim is that had the information contained in those reports been available to him at the time of trial, it would have substantially aided his denial that he had received any bribe moneys and corroborated his defense that Erdman himself retained or otherwise availed himself of those moneys.

Upon the argument of this motion, petitioner's counsel took the position that no evidentiary hearing was necessary and urged that the judgment of conviction be voided solely upon the papers submitted in support of the application. The government was also of the view that no hearing was required, but, contrariwise, urged that the petition for the writ be dismissed for lack of evidential support. Accordingly, petitioner's claims will be decided upon the moving papers, the files, and the trial and hearing records of the case without regard to any new matter presented in the government's answering affidavits.[7] The moving papers now consist of affidavits by petitioner and by his present attorney, which set forth petitioner's contentions, attached exhibits and an affidavit

---

1. United States v. Keogh, 391 F.2d 138, 147 (2d Cir. 1968).

2. United States v. Kahaner, 317 F.2d 459 (2d Cir.), cert. denied, Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed. 2d 65 (1963).

3. United States v. Keogh, 271 F.Supp. 1002 (S.D.N.Y.1967).

4. 391 F.2d 138 (2d Cir. 1968).

5. United States v. Keogh, 289 F.Supp. 265 (S.D.N.Y.1968).

6. 417 F.2d 885 (2d Cir. 1969).

7. *See* United States v. Keogh, 391 F.2d 138, 149 (2d Cir. 1968) ; *cf.* United States v. Carlino, 400 F.2d 56, 58 (2d Cir. 1968), cert. denied, 394 U.S. 1013, 89 S.Ct. 1630, 23 L.Ed.2d 39 (1969) ; 28 U.S.C. § 2255. The government submitted the affidavits of Hundley and Lally, the chief trial prosecutors, each of whom testified upon the prior coram nobis application. Each avers he has no recollection of having seen the February 26, 1962 report in preparation for trial and that he did not in any way conceal or attempt to conceal or suppress the report or any information to which defense counsel might have been entitled.

by his trial attorney, which contains the only new evidential matter presented on this application. No affidavit by any other affiant has been offered to substantiate the charges which, the Court of Appeals observed, to be sustained, must meet "the criteria laid down in our last opinion, 391 F.2d 146–148, and in United States v. Miller, 2 Cir., 411 F.2d 825, 830, 832 (1969)."

I. The report of November 28, 1961.

This report, which related to the finances of the Erdmans, was the subject of the evidentiary hearing on the remand of petitioner's prior application. The remand was limited to the single issue of four bank deposits in February, 1961, totalling $15,539.94, which the report stated could not be identified as to source. The petitioner contended that the report had been deliberately suppressed by the prosecution, and since the unexplained deposits equalled "the total amount of the bribe alleged to have been paid to Erdman in February 1961," this was exculpatory evidence that could have been used to establish that Erdman kept the bribe money. At that hearing, the Erdmans testified, as did the prosecuting attorneys, the FBI agent in charge of the investigation and others who corroborated the Erdmans' explanations. This court concluded that the evidence demonstrated that each of the four deposits derived from an innocent source; that had the report been available to petitioner before or during the trial, it would have been of no aid in furtherance of petitioner's defense, and finally, that the government attorneys were entirely without motivation in failing to turn over the report to the defense.[8]

Petitioner's present claim centers about testimony developed during the course of that hearing. He urges that had he been aware of the evidence which the government advanced to establish the innocent source of the four deposits,

he would have been able to offer a new line of defense and to raise a reasonable doubt of his guilt. It appeared that Mrs. Erdman had a checking account and a safe deposit box in the Meadow Brook National Bank in Woodmere, Long Island; that on February 16, 1961, she redeemed $7,754.18 worth of United States Savings Bonds which she had inherited from her father; that the proceeds were deposited at the bank and drawn upon to pay $7,500 to her mother on account of a loan; that, requiring immediate funds because of an unexpected opportunity to purchase a house, she obtained repayment from her mother of the $7,500 by check, one of the four deposits; that on June 28, 1961, Mrs. Erdman purchased $15,175 face amount United States Savings Bonds,[9] and on June 29 closed out her safe deposit box. Petitioner contends that the existence of the safe deposit box, which was testified to during inquiry with respect to the $7,500 check transaction, was "previously unrevealed," and asserts that the records at the hearing indicated that "the Erdmans had no money available to make that purchase [of bonds in June] other than bribe money." From this, petitioner argues that if such information had been available upon the trial, he could have urged a new line of defense: "[T]hat Erdman had given the bribe money to his wife to secrete in her safe deposit vault; that thereafter, in immediate need of money for the payment of current obligations, he had his wife, with whom he was having marital difficulties, redeem her United States Savings Bonds which she had inherited from her father twenty years before and put money into circulation through the indirect route of his mother-in-law, Mrs. Wexler; that when Moore gave a statement to the FBI revealing the alleged 'fix,' Erdman had his wife take the money out of the vault, close it, and then she

8. 289 F.Supp. at 269–271.

9. This almost certainly was the face amount of the bonds for which the purchase price would be $11,381.25. If the

$15,175 represented the purchase price, the face amount would be $20,233.33, whereas United States Savings Bonds are not issued in such denominations.

used the money to replace the bonds she had previously sold by making the bond purchase of June 28." [10] There is not a single evidential fact to support this hypothetical projection.

■ At the outset, a number of observations are in order. Although petitioner repeats his assertion made at the last hearing that "the Erdmans had no money available to make that purchase," the record is to the contrary. This court has previously found that Erdman's annual professional income alone was $150,000, and that he was a man of substance; [11] also, it appears that Mrs. Erdman was not without substance in her own right. Further, petitioner's claim of a "previously unrevealed safe deposit box" is incomplete. At the conclusion of the last hearing, petitioner contended that it was only as a result of that hearing with respect to the November 28 report that he "discovered" Mrs. Erdman had both a bank account and a safe deposit box at the Meadow Brook bank, which led to the information that she purchased government bonds in June 1961. His charge of the alleged discovery of the bank account was belied by the trial record. Petitioner's trial counsel, in cross-examining Dr. Erdman with respect to bank accounts, asked: "How about an account out in Long Island at the Meadow Brook National Bank?", in response to which Dr. Erdman testified that his wife had an account there and, interestingly enough, in the light of the current charge with respect to the safe deposit box, added: "* * * I think there was a carry-over from when we moved. We did not, you know, take it out." [12] No question was asked and no mention was made of a safe deposit box. Aware of Mrs. Erdman's account at the Meadow Brook National Bank and alert to the significance of safe deposit boxes, including those of a spouse, [13] it is incredible that diligent counsel, had he deemed this of any significance in aid of the defense, would not have pursued the inquiry as to safe deposit boxes in Mrs. Erdman's name. Inquiry at the bank or the issuance of a subpoena for all its records pertaining to Mrs. Erdman would have readily disclosed the existence of the box. Petitioner cannot complain that he was denied a fair trial by the nondisclosure of information which was "readily available to a diligent defender." [14]

■ Finally, no claim is made, nor can one be made, that the government had knowledge of the safe deposit box or the bond purchases at the time of trial, which forecloses any contention that the government deliberately suppressed this information. The information came to light in connection with the extended inquiry concerning the bank deposits set forth in the November 28 report, and in fact bore only a tenuous connection with that inquiry. [15]

10. Keogh affidavit, pp. 4–5.

11. 271 F.Supp. at 1012.

12. SM 755–756. ("SM" refers to the trial transcript; "SMH" refers to the hearing transcript.)

13. *See* SM 3162.

14. United States v. Soblen, 301 F.2d 236, 242 (2d Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962); *see also* Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959).

15. The manner in which the bond purchases came to light is of some significance in this regard. The initial inquiry concerned the source of an unidentified $7,500 check deposit into the Erdman account at the Chemical bank. This was the return by Mrs. Erdman's mother of a repayment of like amount by Mrs. Erdman on account of a loan. The inquiry then shifted to the source of the funds used to repay the mother. Those were found to have come from the redemption of government bonds held by Mrs. Erdman and inherited from her father. The bond redemptions were effected through Mrs. Erdman's account at the Meadow Brook bank. At that point, the original hearing was closed, except for the limited purpose of receiving additional testimony of Meadow Brook bank officials as to February 1961 deposits in Mrs. Erdman's account and her bond redemption records which they had not been able to locate at the time of their

As to the materiality of the allegedly withheld matter, its exculpatory value to the defense, the theory ultimately advanced here is no more than pure speculation, without the slightest basis or support in the record. The mere fact that a wife has a safe deposit box regularly maintained by her (opened in May, 1959), that her husband possessed bribe moneys in February, 1961, that four months later, on June 28, she purchased $15,175 face value government bonds, a not unusual purchase for her, and the next day closed the box (which was far removed from her then home),[16] would not, without more, permit the imaginative inference urged by petitioner that the bribe money was not paid to petitioner but was cached by Erdman in his wife's box and was later used to purchase the bonds to replace those she had earlier sold. It was not shown that at the time of the conspiratorial activities Mrs. Erdman was aware of her husband's role. Mrs. Erdman, an attorney, was not a witness at the trial; she testified at the coram nobis hearing that she did not know that her husband was under investigation in June, 1961; that she had no knowledge that Dr. Erdman handled any of Moore's money; that she never discussed anything about Moore with her husband and knew nothing about Moore until the trial, which started in May, 1962. This court found her an entirely credible witness;[17] her testimony was convincing; her version about redeeming the inherited bonds, attacked by the defense as a "fantastic" story,[18] was eventually corroborated by irrefutable documentary proof under a fortuitous circumstance.[19] It taxes credulity beyond the breaking point to accept, without any evidential support, the claim that a husband who, as petitioner asserts, "was having marital difficulties," entrusted his wife with $35,000 cash bribe money, persuaded her to redeem bonds inherited by her from her father, circulated the bond proceeds through his mother-in-law in a devious way to meet current living expenses, and when the corrupt scheme, of which Mrs. Erdman was unaware, was about to be

original testimony, SMH 1009; United States v. Keogh, 289 F.Supp. at 268. In disregard of the court's ruling, petitioner sought to broaden the inquiry beyond the scope of the remand and sought other records at the Meadow Brook bank, including any safe deposit box, although neither Dr. Erdman nor Mrs. Erdman had been asked about or mentioned a safe deposit box in connection with the bonds or otherwise, SMH 942–43. When a Meadow Brook official returned to report on a continued search to locate the records, he testified that Mrs. Erdman maintained a safe deposit box there, SMH 946. Petitioner's attempt to go beyond the remand extended to an inquiry to bond purchases in February, March or April, 1961, and then in June 1961, as well, although no mention whatsoever had been made of bond purchases. Although holding that these matters were not within the scope of the remand, the court, to conclude the matter, telephonically obtained from government officials information that Mrs. Erdman had purchased in February, 1961, two $175 bonds and on June 28, 1961, made two bond purchases, one totalling $7,125 and the other $8,050; this information was passed on by the court to petitioner, SMH 964; 1009–13. Realistically, then, the discovery of the bond purchases was not triggered by the November 28, 1961, report, but by reference to savings bonds when the inquiry was focused upon and limited to alleged "unexplained" bank deposits or alleged concealment of moneys. Such an inferential connection could just as well have been made at any time, including during the trial, when petitioner knew of Mrs. Erdman's Meadow Brook bank account, without regard to an FBI report or an evidentiary hearing.

16. Although the Erdmans moved from Great Neck, Long Island, in September, 1960, to Riverdale, New York, Mrs. Erdman continued to maintain her account at the Meadow Brook bank at Great Neck, Long Island. She issued the check drawn on the Meadow Brook bank to her mother in February, 1961, United States v. Keogh, 289 F.Supp. 265, 267 (S.D. N.Y.1968).

17. Mrs. Erdman has died since the first coram nobis hearing.

18. SMH 819–820.

19. United States v. Keogh, 289 F.Supp. 268 n. 8.

revealed by a participant she did not even know, withdrew, upon her husband's direction, the cached bribe money to purchase government bonds to replace the previously redeemed bonds. Such an argument is not only conjectural, indeed, it defies common sense.

■ It is true that the implausibility of a claim does not necessarily deter forensic endeavor, but it is also true, as so often stated, that jurors do not shed their common sense when they sit in judgment. The test of materiality is not whether petitioner's counsel might have presented still another argument, however fanciful, but whether, in a proceeding such as this, the alleged "undisclosed evidence would have permitted the defendant so to present his case that he would probably have raised a reasonable doubt as to his guilt in the mind of a conscientious juror. * * *" [20] Other theories advanced at the trial, some of which did have evidential support, planted no reasonable doubt in the mind of a single juror. The present variant, without a shred of evidential support, could have added no weight to the defense. In the light of the fact that defense counsel did argue that Erdman kept the bribe money, it would not even have served to alter trial tactics.

The court is firmly convinced that no conscientious juror would have been swayed by petitioner's latest conjectural and highly improbable theory. In sum, the court concludes that the claimed undisclosed evidence would not have resulted in raising a reasonable doubt of petitioner's guilt in the mind of a single juror; so, too, it raises no doubt in this court's mind.

II. The report of February 26, 1962.

We next consider petitioner's claim with respect to the Ace Manufacturing Company report, which, as the Court of

Appeals noted, is inconsistent with the claim centering about Mrs. Erdman's safe deposit box and bond purchases.[21]

When the Court of Appeals declined to pass upon petitioner's claim with respect to the alleged suppression of the February 26, 1962 report, it noted that nothing about it had been developed at the coram nobis hearing; that neither Dr. Erdman nor the prosecutor had been examined on the subject, and no attempt had been made to obtain the testimony of Forman or Moore. None of the aforesaid persons has been examined, nor any affidavit been submitted from any one of them.[22] Thus, with the exception of Mr. Singer's affidavit, hereafter discussed, the record remains in the same posture as when the Court of Appeals found it insufficient upon which to "warrant * * * directing issuance of the writ when the question had not been explored in depth." [23]

At the coram nobis proceeding, or earlier, at the disbarment hearings, an FBI report dated February 26, 1962, which related to investments of Erdman, Moore and Forman in the Ace Manufacturing Company, was made available to petitioner. At the disbarment hearing, another report, dated January 24, 1962,[24] dealing generally with the affairs of the Ace Manufacturing Company, had also been made available. The two reports consist of forty-two single-spaced typewritten pages and reflect the investigations of a number of FBI agents. The February, 1962 report, in summary, relates to a $50,000 investment by Moore and Forman (two-thirds) and Erdman (one-third) for a half interest in Ace Manufacturing Company, a Baltimore concern. It indicates that the bulk of Erdman's share was met on April 28, 1961, by his check for $6,917 and a check of Jerome Edelman, a lawyer, in the sum of $6,000, which were received

20. 391 F.2d at 148.

21. 417 F.2d 885, 889 n. 6 (2d Cir. 1969).

22. Except the affidavits of Hundley and Lally, see n. 7 *supra*.

23. 417 F.2d at 889.

24. Also a report of October 17, 1961, n. 53 *infra*.

on that day by attorney George Becker, who acted for the investors;[25] also, that Erdman had issued a check in the sum of $3,750 directly to Ace on April 14.[26] The Moore-Forman investment was by check payable to Gerald Topper in the sum of $33,332.66 dated April 28, 1961, bore the name of Gabe Forman, and was drawn on the Meadow Brook National Bank, where an account, "introduced by S. Moore," had been opened on May 2 with a $100 deposit. The check was received at the bank on May 4 and was paid the following day against a cash deposit of $33,350 in denominations of 10, 20, 50 and 100 dollar bills. The report further states that Forman's attorney had notified the FBI that he had advised Forman not to discuss the matter with the FBI.

The Ace investment had been probed into upon the trial upon a theory, one of a number as to what happened to the bribe money, that the bribe money had found its way there. The defense had tried to link this theory to Erdman's statement to the bankruptcy trustee of Moore's company, Gibraltor Amusements, Ltd., that with respect to his endorsement of $50,000 in restitution notes, he had security of $35,000,[27] and his explanation upon the trial of his

statement. The petitioner now asserts that "the prosecutor's failure to turn over the February 26 FBI report was the result of deliberate suppression" and that the information as to the deposit of $33,350 in small bills in a recently opened account in the name of Gabe Forman, had it been turned over at or prior to the trial, would have served to corroborate petitioner's claim that Erdman had never given him any of the bribe money; also, it would have been of value to support a claim that "even if the money had been paid to Erdman" for bribe purposes, Erdman had returned it to Forman and Moore in the form of the Ace investment.

■ Preliminary findings are in order. There is upon this record not a scintilla of evidential support for petitioner's charge that the alleged failure of the prosecution to turn over the February 26 and the January 24, 1962 reports, was "the result of deliberate suppression" by the prosecutor.[28] Equally important, it has not been adequately established that in fact those reports were not turned over and available to the defense at or before the trial. The guarded affidavit of Henry G. Singer, petitioner's trial counsel, submitted only after the government had noted its omis-

---

25. Erdman testified as to his investment and offered to produce for defense counsel his checks, which he suggested could give precise dates, SM 637–38. The offer was not accepted. Also, on cross-examination by Singer, Erdman testified a lawyer gave him "about $6,000" in the form of a loan, which he used as part of his Ace investment, SM 1061–63.

26. This check, Erdman testified, was delivered to Lawrence, the president of Ace, SM 625a, 637.

27. In a letter to the trustee, he stated, "I am security for the first $35,000.00. * * * "

28. Petitioner makes the additional claim that the prosecution was under a duty to turn over the February 26, 1962 report pursuant to the Jencks Act, 18 U.S.C. § 3500 (1964), since it contained a summary of an interview with George Becker, an attorney, which related to the investment

closing. At the trial, Becker, under a brief cross-examination by the defense, testified as to his role in the Ace transaction, SM 2055–56. The government, on direct examination, asked no question with respect to Ace. Becker's direct testimony was limited to his representation of Moore and the other defendants in the criminal bankruptcy proceeding, events related thereto, and as to his having been shown by Moore $20,000 stated to be used for the "payoff." The statutory language is clear: "Section 3500 only requires the production of statements relating to a witness' direct testimony." United States v. Mayersohn, 413 F.2d 641, 643 (2d Cir. 1969), cert. denied, 397 U.S. 906, 90 S.Ct. 903, 25 L.Ed.2d 87 (1970). Petitioner's further claim that Becker's direct testimony related to the Ace investment because Becker testified that he saw money claimed to be part of the bribe money, and petitioner's theory was that the bribe money ended up in Ace, merits no further comment.

sion from the moving papers, states that his "best recollection" is that he did not see the reports at or prior to the trial. He adds that: "Every F.B.I. report or statement which was turned over to me during the original trial was marked for identification." Petitioner submits the clerk's trial minutes which list exhibits introduced in evidence or marked for identification and which do not list the FBI reports of January 24 or February 26, 1962. However, the fact is that although voluminous material was turned over to the defense, including, in addition to Jencks Act statements, reports the government was not obligated to disclose,[29] not all such material was noted in the clerk's minutes.[30] The record indicates that some exhibits were not marked for identification until used by the defense on cross-examination,[31] and others were never marked at all, although actually used, in the examination of witnesses. To cite examples: co-conspirator Schwach was cross-examined by Singer with reference to his signed statement of July 4, 1961,[32] and his grand jury testimony;[33] yet, neither was marked for identification; and this

was so in the instance of other FBI reports of interviews of Schwach that were turned over to the defense.[34] So, too, Becker, the attorney, was cross-examined on the basis of his grand jury testimony, which had been submitted to the defense under the Jencks Act. But this is nowhere listed in the clerk's minutes.[35] And there were instances when Jencks Act material that was delivered to the defense but not used to cross-examine the witness does not appear in the clerk's minutes, as in the case of Judge Rayfiel's statement and his grand jury testimony.[36] Thus, the only support for petitioner's claim that the reports were not turned over to the defense is Singer's carefully guarded statement based upon his "best recollection," the reliability of which is at once challenged by the demonstrated inaccuracy of the remainder of his affidavit as to documents marked for identification. Petitioner has failed to submit any corroborating affidavit on this subject, of his other trial counsel or of other attorneys who represented the codefendants,[37] or to give any explanation for his failure to do so. The court finds upon this

---

29. *See* 289 F.Supp. at 272. At the coram nobis hearing Hundley testified: "[D]uring the trial we turned over everything that was asked for and some that wasn't." SMH 245; *see also* SMH 224, 282.

30. The current practice requires the complete listing in the clerk's minutes of all § 3500 material, whether used or not.

31. During the trial, for example, the following occurred: "MR. KLEINMAN: I take it that this [statement of Walter Cohen] hasn't been marked, Mr. Hundley? "MR. HUNDLEY: As a matter of fact, none of those statements that we turned over have been marked for identification. I want to point that out to the Court. "MR. KLEINMAN: Can we have this one marked for identification?" SM 1947: *see also* SM 1785.

32. SM 2146–47.

33. SM 2147–48.

34. SM 2145–46.

35. SM 2001–03.

36. Judge Rayfiel testified before the grand jury on September 21, 1961, and his interview by the FBI on August 16 was recorded in Agent Young's report on August 23, 1961.
 *See* Mr. Singer's statement: " * * * I have read the testimony of Judge Rayfiel, who is going to be called as a witness, and every other witness whose testimony I have. * * * " SM 2169.
 At the disbarment hearing, petitioner's present counsel, who did not participate in the trial, denied that Judge Rayfiel's statement of August 16 had been produced at the trial. But attorney William Kleinman, who represented Kahaner, responded to the referee's inquiry: "I have a hazy recollection that, in advance of Judge Rayfiel's testifying, sort of as a matter of course Mr. Hundley used to hand us, or—I was more concerned with it at that time—some statements; so I cannot say positively that we were not given the statement, but I know it was not used." Disbarment minutes, 539–40.

37. William Kleinman, one of the attorneys, who represented codefendant Kahaner, is deceased.

record that petitioner has failed by credible evidence to support his claim that he did not have available at the trial the February 26 and January 24, 1962 reports, or the relevant information contained therein.

But entirely apart from that finding, which alone requires dismissal of the petition, the fact is, whether or not the reports themselves were in the possession of the defense at or before trial, the substance of the relevant information contained therein was either fully developed at the trial upon the cross-examination of Moore, Erdman and Forman and hence known to the defense, or was readily available to the defense by further cross-examination or by subpoena. Further, the nature of defense counsel's inquiry suggests they knew much more about the transaction than petitioner reveals on this application.

Moore testified that his and Forman's share of the Ace investment had been sent by Forman from England to him at the Meadow Brook National Bank in the form of a bank check, which, because of his bankruptcy involvement, he immediately cashed so that no creditor could reach it; that the investment was made in Forman's name for both of them; that the check he "got from Forman, [he] used in Forman's name"; [38] that as to the check to Ace for the investment, he believed Forman wrote his own check and that he got the money from the Meadow Brook National Bank in Woodmere. Forman testified that his and Moore's investment in Ace was "33 [thousand dollars] and change"; [39] he denied that the investment came from the money he sent over in February and March, 1961, totalling $25,000 and $8,500, part of the Kerner loan.[40]

Moore was not cross-examined further as to the cash breakdown or the means of conversion of the bank check to cash, or as to the bank depository. Forman was not cross-examined further as to the source of the investment in Ace, which he denied included the bribe money sent over from England—and there was nothing to stop petitioner's counsel from pursuing these inquiries. Moore's repeated attempts to give more specific details as to the transaction were cut short by the defense.[41] Erdman's offer to produce his checks covering his investment in the Ace transaction and to verify the precise dates was not accepted by his cross-examiner.[42]

The FBI reports, rather than being exculpatory, provided documentary corroboration of those who testified to the Ace transaction. Moreover, this by no means was a case of information in the exclusive control or possession of the prosecution. The information contained in the reports was as much available to the defense as to the prosecution.[43] With respect to the denominations of the bills, all the defense had to do was to follow through on cross-examination or subpoena the Meadow Brook bank records to secure the details as to the breakdown and the Forman account.

Since the defense was aware of the cashing of the check, knew of the Meadow Brook accounts, and did not deem it necessary to make further inquiry, no reason is suggested why government counsel should have noticed or attached significance to it, if they knew or recalled the breakdown of the cash, or the account on which the investment check was drawn, referred to in the lengthy single-spaced report. If information allegedly withheld by the prosecution is

---

38. SM 1292. Erdman also testified that "because of Moore's bankruptcy troubles the money was to be in Forman's name. * * *" SM 643; see also Becker's testimony, SM 2056.

39. SM 2238.

40. SM 2239. "MR. SINGER: * * * Q Isn't that where the 33,500 that went

to Ace came from? A No, that is not where that came from, no."

41. SM 1289–90.

42. SM 637–39.

43. See United States v. Birnbaum, 421 F. 2d 993, 996 (2d Cir.), cert. denied, 397 U.S. 1044, 90 S.Ct. 1363, 25 L.Ed.2d 655 (1970).

nonetheless known to the defense in the course of the trial, or could readily be obtained by diligent counsel, the defense can make no claim of prejudice.[44]

Quite apart from the fact that the substance of the 1962 reports was neither unknown nor unknowable to the defense at the time of trial, the court is of the view that the information could not have been material to the conduct of the defense or the outcome of the trial. In this context, and viewed against the background of defense counsel's inquiry, Singer's affidavit is significant for what it does not say. Singer does not say that he was unaware of the contents of those reports. He does not say that possession of the information allegedly unknown to petitioner at the time of trial, that the cash used to cover the investment check was in small bills, would

have affected his trial strategy, his cross-examination, or been of aid to the defense. And this omission is highlighted by the circumstance that Singer, in cross-examining the witnesses, showed unusual familiarity with the Ace transaction.[45]

Also significant is the absence of affidavits from Moore, Becker and others having knowledge of the details of the transaction and its closing, or any explanation for their omission. That omission takes on added significance, since on petitioner's prior application he secured affidavits apparently without difficulty from Moore, Becker and others. Although this court rejected the attempt of those affiants to attenuate in some respects their trial testimony in an obvious design to aid petitioner,[46] the fact remains they did cooperate with him and furnished the affidavits.[47]

44. *See* Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959) (Frankfurter, J.) ; *cf.* United States v. Keogh, 417 F.2d 885, 887 (2d Cir. 1969) ; United States v. Soblen, 301 F.2d 236 (2d Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962).

45. Petitioner also asserts that the information as to the Forman bank account and the deposit therein was not known to the defense at the time of trial. In the light of that claim, which ignores Moore's testimony that he believed Forman's check was given to Ace to cover the investment, that the money came from the Meadow Brook bank in Woodmere, and other details of the transaction, part of Singer's cross-examination of Forman is rather revealing. Singer first suggested that Forman and Moore had put up $35,000 (the exact amount of the bribe money) as their share of the investment in Ace. Forman kept insisting that they had put up only about $33,000, "33 and change." [SM 2238]. Forman was never any more explicit as to the exact amount. Singer then took a slightly different tack, as follows :

"Q Well, let's see : If you took the 5000, the two 10,000's would be 28,-000 and 8500 that Kerner said he drew from the bank, you'd have exactly 33,-500?" [SM 2238–39].

After being questioned by the Court on his arithmetic, Singer tried again :

"Q Let me get the exact figures. 5000 and two 10's is 25,000; is that right?

"A Right.

"Q And the 8500 Kerner says he cashed in the bank in three checks, that is 33,500 ; that is the exact amount within a few dollars of your alleged investment in Ace?

* * *

"Q Isn't that where the 33,500 that went to Ace came from?

"A No, that is not where that came from, no." [SM 2238–39]. Moore had testified that he first received $5,000 from England and later an additional $20,000. The remaining $10,000 he said came from a loan from the Esco Trading Company in the form of a check to Kerner (another defendant in the Eastern District prosecution, named as a co-conspirator in the present case), who deposited it in his account and then withdrew cash. Although Kerner had testified that he withdrew only $8,500 from the bank, he also testified that he collected an additional $1,500 from his vending machine routes and turned over $10,000, not just $8,500, to Moore. Nonetheless, petitioner now claims that he did not know that the exact amount of the Ace investment of Moore and Forman was $33,332.66, or that the check for that amount was covered by a cash deposit of exactly $33,350.

46. United States v. Keogh, 271 F.Supp. at 1013.

47. *Cf.* Sobell v. United States, 264 F. Supp. 579, 596 (S.D.N.Y.), aff'd per curiam, 378 F.2d 674 (2d Cir. 1967).

Finally, the theory which petitioner now advances finds no support in the record. In the absence of evidence from any of the participants, Moore, Erdman, Forman and others having knowledge of the facts, it rests upon surmise and conjecture. With the Ace investment situation known to the defense,[48] it was thoroughly probed into in support of petitioner's denial that he had received any of the bribe money from Erdman, who, according to one defense theory,[49] had kept the money and later invested it in Ace. Petitioner's basic contention here is that the cash deposit of May 5 could have been used to corroborate his defense by urging upon the jury that "Erdman had in fact given to Forman * * * the $33,350 in cash which Forman deposited in his new account in the Meadowbrook Bank to cover his check to Ace," and that even if the money had been paid to Erdman, "he gave it back to Forman and Moore in the form of the Ace investment." Other than its bare assertion, there is not a scintilla of evidence to support the charge that the cash deposited in the Forman account came from Erdman; the trial record, as already noted, indicates its source to have been otherwise. Petitioner, however, relates the cash deposit on May 5 to Forman's request[50] upon Erdman to return the bribe money because the fix had not been accomplished. The matter, however, cannot be considered in isolation; also relevant is the matter of the restitution plan which, according to the government's evidence, was suggested by Kahaner shortly after the sentence on March 30, 1961, and thereafter furthered by Keogh and others, and which it was charged was an extension of the conspiracy when it failed of its original purpose to secure suspended sentences for Moore and his co-defendants in the Gibraltor Amusements criminal case.

Forman testified that he first met Erdman in early May, a few days after his return to the United States, at which time he asked what was going to happen with the money, and Erdman asked for "a little time and we will work it out"; that about a week later, at the Ace plant at Baltimore, he asked Erdman for the return of the money because "he didn't deliver," and Erdman offered to give back $5,000 cash and a $30,000 note, which was not acceptable, whereupon Erdman again asked for "a little more time." Later, in New York, about the middle of May, there was another discussion about "returning the money," when Erdman said he would arrange for Forman and Moore to see the judge and to ask his help; also, that in one of the conversations Erdman stated, "he had given most of the money to the judge and gave some of it to Kahaner."

Erdman testified he first met Forman in early May upon his return from England; that Forman was disturbed because the fix had not gone through;

48. Grand jury minutes and statements containing specific references to it were turned over by the government to the defense.

49. The defense had various and varied theories as to the disposition of the bribe money—all in denial that any ever reached petitioner or Kahaner. The Kahaner defense had "no doubt" that Erdman got the money from Moore, but that he kept it; also, that it landed in Ace Manufacturing Company and it was "security" for Erdman's endorsement of the restitution notes, a theory generally adopted by the other defendants. The Keogh defense doubted the bribe money had ever been raised, but if so, and Erdman did get the $35,000, it was "right down in Ace"; in the process, however, Erdman and Moore had "got together to cheat" Forman and had "stolen" part from Forman. Now the claim no longer is that Forman was cheated, but that Erdman returned the bribe money to him in the form of the Ace Investment. Also, there is the other recently advanced theory that part of the bribe money was used on June 28 by Mrs. Erdman to buy bonds to replace those she had previously redeemed a theory which flies in the face of the claim of repayment to Forman almost three months before.

50. Petitioner fixes this day as May 4, in disregard of substantial evidence to the contrary.

that he told Forman if he wanted "to ask the judge for the money back," he would arrange for a meeting. Thereafter, at a conference at Keogh's chambers, Forman was introduced to Keogh by Erdman, who urged upon petitioner that he must help Moore, who was also present; however, nothing was then said about the return of money. Erdman further testified that at this conference Keogh expressed the view that with restitution everything would work itself out. There was testimony that at that conference petitioner asked about the importance of Jaspan, the attorney for the trustee, in any restitution settlement, and said he would have the attorney in his office the following week. There was also testimony of another conference at petitioner's chambers on May 22, again attended by Erdman, Forman and Moore, later joined by Jaspan, at which, among other matters, the proposed restitution agreement was considered, as well as Erdman's endorsement of the notes, without which the trustee would not consent to the proposal. The details of these and other meetings and other pertinent events, petitioner's role with respect to the restitution agreement, culminating in Erdman's endorsement of the notes on May 31, are contained in the record and need not be repeated here.

Forman testified that it was because the money had not been returned that Erdman had endorsed the $50,000 in restitution notes. Forman further testified that as late as July 6 he had not received a satisfactory explanation from Erdman as to what he had done with the bribe money other than that he had given it to Keogh and Kahaner, and Erdman himself testified that as late as July Forman was pressing for the money.

Notwithstanding this and other evidence, petitioner contends that information of the cash deposit in small bills in the Forman account would have supported his denial that he ever received the bribe money. In fact, it would have lent no support whatsoever to that defense. If, as petitioner's present theory runs, Erdman had, by May 5, returned to Forman the bribe moneys, which Forman deposited in the Meadow Brook bank to cover the check to Ace, the demands thereafter upon Erdman for the return of the money are senseless. So, too, if Erdman had made repayment by May 5 and was free from any pressure, there was no reason for him to endorse the restitution notes on May 31. Moreover, if Erdman had returned the money by May 5, after hiding it somewhere for several months, Erdman's implication of Keogh and Kahaner, each of whom acknowledged he was his friend and physician, would be without motivation and entirely inexplicable. It was on the theory that Erdman intended to and did keep the bribe money that the defense was able to argue to the jury that, "when his iniquity was discovered," Erdman was motivated to involve Keogh and Kahaner in order to allay Forman's suspicion, to protect himself from retaliation, and allegedly "to gain favor with the Government." [51] But if Erdman had returned the bribe money by May 5, the basis for this contention evaporates. Having heard Erdman testify that he paid the bribe moneys to Keogh and Kahaner (Moore testified that in Erdman's presence he passed $2,500 of the bribe money to Kahaner), the jury would have had to ask itself, if the money had been repaid by Erdman, as now claimed, by May 5, what possible reason could there have been for him to have concocted a story, to have implicated and to have continued to implicate Keogh and Kahaner, his friends, and in the process to involve himself.

█ The information which petitioner now deems of significance must be viewed against the totality of all the evidence. What was presented to the jury was a miasma of corrupt conduct in an attempt to fix a case. As to petitioner, in addition to Erdman's testimony that

51. 317 F.2d at 476.

he paid petitioner "fix" money on two occasions, proof was also presented among other matters, that shortly after and on the day of the second payment, petitioner discussed leniency for Moore with Judge Rayfiel at Erdman's request; that Judge Rayfiel indicated that leniency was not merited because Moore was a bad man with a bad record who had committed a serious crime; also there was a rumor that "everything has been taken care of"; that nonetheless thereafter petitioner arranged for Erdman to see Judge Rayfiel before the sentencing; that petitioner saw both Erdman and Moore's attorney with respect to the matter the morning of the sentencing; further, that following the imposition of sentence petitioner's role in the restitution negotiations included talks with Jaspan, the attorney for the trustee, then engaged in an unrelated litigation before petitioner; meetings in his chambers, including the summoning of Jaspan to one attended by Moore, Erdman, Forman and petitioner; his advice to Erdman, following the delivery of the restitution agreement and endorsed notes, as to an application for a motion for reduction of the Moore sentence; and other activities of petitioner in the restitution situation. Considered with respect to the evidence of the Ace transaction that was presented to the jury, and against all the trial testimony, the allegedly unknown information pales into insignificance. The fact is that the Moore-Forman Ace investment of thirty-odd thousand dollars was known to

the jury, and other significant details of the transaction were before it. The defense theory as to the Ace investment had been extensively urged upon the jury in summation, with heavy emphasis upon the trustee's testimony. The charge that Erdman had kept the money was the focus of a bitter attack upon his credibility. He, Moore and Forman were subjected to as raking a cross-examination as experienced and able counsel could summon in their combined efforts to discredit their testimony.

In the light of all the developed facts of the Moore-Forman investment in Ace, there was no significant chance that added evidence of the currency breakdown, however availed of by the defense, could have induced a conscientious juror to a different vote.[52] The court concludes that that evidence and other matters now relied upon would not have been of material aid to the defense, its configuration or its strategy, nor would it have affected the result of the trial. Any other view would be unrealistic.

Petitioner refers to several other items in the reports, none of which causes this court to entertain any contrary view to that just expressed, and they need be but briefly considered. These are the reference in the February 26 report to the date of the check covering the Forman-Moore investment in Ace, and a statement in an FBI report dated January 24, 1962, attributable to Lawrence, the president of Ace, as to Forman's presence in the United States.[53]

---

52. United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969); United States v. Keogh, 391 F.2d 138, 146–148 (2d Cir. 1968); cf. United States v. Birnbaum, 421 F.2d 993, 996 (2d Cir.), cert. denied, 397 U.S. 1044, 90 S.Ct. 1363, 25 L.Ed.2d 655 (1970); United States v. Acarino, 408 F.2d 512, 516 (2d Cir.), cert. denied, 395 U.S. 961, 89 S.Ct. 2101, 23 L.Ed.2d 746 (1969).

53. Petitioner also charges that an FBI report of October 17, 1961, contained information that was "suppressed." The report, a summary of investigative activities, sets forth (Exhibit C, p. 55) that an examination of Erdman's deposit slips at the

Chemical Bank New York Trust Company reflects "only two cash deposits, one on April 17, 1961, for $2,500.00 and one on May 3, 1961, for $2,000.00." Despite this simple statement, petitioner charges " * * * that these deposits were unexplained as to source and were necessarily made by Erdman in order to cover the two checks he had written in connection with his investment in Ace Manufacturing." The report nowhere states that the deposits are "unexplained"—that is petitioner's allegation. No evidence has been submitted or developed to support petitioner's charges with respect to this report; nor is there any proof that petitioner did not have it at the trial (Singer's af-

As to the first item, petitioner contends that had he known at the time of trial of the $33,332.66 check which bore the date April 28, 1961, it would have served to corroborate his testimony that Forman and Moore, as well as Erdman, were in his chambers on March 29, 1961, which was denied by the latter three. Erdman had testified that on March 29 he was alone with Keogh in his chambers when he gave him $17,500, part of the fix money. Forman testified that he had been abroad from July, 1960 to April 30, 1961, when he returned from England by plane; Moore also denied he was in Keogh's chambers on March 29. Petitioner further contends that the check could have been availed of to negate the force of the prosecution's attack upon his credibility, which relied upon Forman's passport and entries therein to corroborate the testimony of Erdman, Forman and Moore.

 Petitioner indulges in a number of assumptions to support the claim of suppression of material evidence. He assumes that the report states that the check was actually signed on April 28, the date it bears, and that it was actually signed by Gabe Forman. The report states no such thing. It simply states that a Recordak film of the check reflected it is "dated April 28, 1961, payable to 'GERALD TOPPER' in the amount of $33,332.66. * * * [I]t was drawn on account number 112–17–6861 at the Meadow Brook National Bank, Woodmere, Long Island, New York, and was signed 'GABE FORMAN'." [54]

Again the petitioner's failure to offer affidavits or testimony of those with knowledge of the facts as to the issuance of the check and the closing of the transaction, and his indulgence instead in unwarranted assumptions, is high-lighted. Entirely apart from the passport, the testimonial proof was overwhelming that Forman did not arrive in the United States until April 30, 1961. Petitioner, from the mere fact of the date April 28 on the check, takes a giant leap backward to March 29 to contradict the testimony of three witnesses and documentary proof. An inference from the mere date of the check, if permissible at all, in the absence of other proof, would not, in this court's judgment, have swayed a single juror—particularly so, in the face of the consistent testimony of Erdman, Moore and Forman, corroborated by the two passport stamps placing Forman in England until his arrival here on April 30 and outside the United States on March 27, when considered against Keogh's original statement to the FBI, which coincided with Erdman's version that they were alone at the March 29 meeting, but was at odds with Keogh's own trial testimony, his uncertainty at the trial that it was Forman who was introduced to him on March 29, and his dubious explanation of refreshed recollection based on a diary entry, that resulted in his differing trial testimony.[55] Inconsistencies of greater proportion than here alleged were exposed and argued extensively by the defense. The information here relied upon by petitioner against the background of the

fidavit does not mention this report). The fact, blithely ignored by petitioner, is that the deposit slips for the $2,500 and the $2,000 items were made available to petitioner at the trial, were initially offered as exhibits by his counsel, but, following a discussion as to their admissibility, were marked for identification. Dr. Erdman was subject to recall for questioning as to these and other cash deposit slips, but petitioner's counsel did not follow through on his offer of the deposit slips (see 391 F.2d at 143–44). Any claim of suppression or any other alleged wrongful conduct with reference to

the two cash deposit slips referred to in the report, or any matter pertaining thereto, is specious.

54. Moore testified that he thought Forman had issued the check for the Ace investment and that the funds came through the Meadow Brook bank. Defendant's counsel could readily have issued a subpoena, which would have turned up the Recordak film of the check.

55. *Cf.* United States v. Kahaner, 317 F.2d 459, 480 n. 13 (2d Cir. 1963).

trial testimony could not have been of material aid in furtherance of his defense or affected the jury result.

And of even less substance is his further contention with respect to a statement attributable to Lawrence, the president of Ace, in the FBI report of January 24. Petitioner's claim here is based upon a distortion of what in fact is set forth there. It reports that Arthur Lawrence, president of Ace, when interviewed by an FBI agent in June, 1961, stated that around Christmas 1960, "David Foreman," residing in England, obtained an order for 100 slot machines, which were to be shipped to England; that "after returning to the United States [he] visited the Ace Manufacturing Company plant at Glen Burnie, Maryland"; that Forman, who subsequently resided at Oceanside, New York, "interested Dr. Erdman and Sanford J. Moore in Ace Manufacturing Company with a view toward having them invest money in that company." The report nowhere states that Lawrence fixed the date when Forman returned to the United States or resided at Oceanside, New York. However, petitioner's attorney argues: " 'This interesting of Erdman and Moore' obviously culminating in the agreement of April 28, 1961 between Forman, Erdman, Moore and Ace Manufacturing * * * had to be prior to that date." Again, without evidential support,[56] he concludes: "It is clear from the January 24, 1962 FBI report that Forman was in the United States at or sometime or times between Christmas 1960 and April 21, 1961. * * *" The latter date is based on a letter dated that day, also referred to in the same report, sent to Dr. Erdman by attorney Topper with respect to Ace's financial status. Topper's letter makes no reference to Forman. Petitioner's conclusory allegations are neither sustained nor warranted by the report allegedly withheld. There is not the slightest basis for the assertion that it could have been of significant use to support petitioner's version as to who was present at the March 29 conference. Petitioner has had the January, 1962 report for several years prior to the filing of his instant application; again, the omission of an affidavit from Lawrence, Topper or any supporting data or any explanation for their omission is striking.[57] The information could not materially have aided the defense; it does not reach the level of evidence that could possibly have been useful to the defense.[58]

■ In conclusion, viewed against the background of the trial and the totality of the trial evidence, neither singly nor in combination would any of the information contained in the January 24 and February 26 reports, allegedly unknown to petitioner at the time of trial, have materially aided the defense, its preparation or presentation. This court is satisfied to a moral certainty that such information would not have permitted the petitioner so to present his case that he would probably have raised a reasonable doubt as to his guilt in the mind of a single juror—and so, too, it raises no such doubt in this court's mind.

■ The petitioner urges this court to reconsider its previous finding regarding lack of motivation of the prosecution. The court, with respect to the report then under consideration, found "no conscious or deliberate withholding * * * by members of the prosecution staff, and further that they cannot even

56. Petitioner disregards the overwhelming evidence that Forman learned of the Ace investment while abroad through Moore during one of their regular transatlantic telephone calls, which occurred about every ten days or two weeks.

57. It has already been observed that defense counsel refused Erdman's offer to "bring my checks here this afternoon and my checks will show that the first payment to Ace was prior to Forman arriving in this country." SM 639–640: see n. 25 supra.

58. Cf. United States v. Bonanno, 2d Cir., 1970, 430 F.2d 1060; United States v. Tomaiolo, 378 F.2d 26, 28 (2d Cir.), cert. denied, 389 U.S. 886, 88 S.Ct. 159, 19 L.Ed.2d 184 (1967).

be faulted for forgetfulness, much less negligence."[59] Nothing has now been presented to cause this court to change that finding, or to make any other finding, with respect to the January 24 and February 26, 1962 reports, assuming they were not turned over or made available to the defense. The record is barren of any evidence to support a charge of any deliberate purpose or design by the prosecution to suppress or withhold in any respect information or evidence that could have been of material value or use to the defense, its preparation or presentation. Indeed, this court's current review of the record in connection with the instant application reaffirms the view previously expressed that "[t]his was not a case where the prosecution held its records close to its vest."[60] The record discloses an attitude by the prosecution of making available to the defense more than was legally required.[61]

Repeated statements by petitioner's counsel, who was not a participant in nor present at the trial, that the case against the petitioner was a close one requires this court, in the interest of an accurate record, to repeat its previously expressed observation:

> "[T]hat the evidence presented against petitioner was overwhelming; that it did not rest solely upon Erdman's word against petitioner's; and that there was corroborative evidence of a substantial and most compelling nature, much of it based upon petitioner's acts and conduct as well as documentation in his handwriting."[62]

One had to be present at the trial from day to day as it unfolded, and to have seen and heard the witnesses, government and defense, to have sensed "the actualities of a long trial,"[63] to understand that the government's case as finally developed cascaded down with the force of an onrushing falls, and that the information now relied upon, allegedly suppressed, could not and would not have averted the verdict of guilty. The court concludes that no act, conduct or omission on the part of the prosecution in any respect violated petitioner's constitutional right to a fair trial. He received a fundamentally fair trial. The interest of justice does not require a new trial.

Unless we have reached the point that a trial must be flawless, that there must be perfect symmetry in the testimony of government witnesses, that the prosecution must disgorge its entire file to the defendant, whether or not it has matter useful to his defense, there is no basis upon the charges contained in the moving papers, which in the main consist of argument and assumptions by petitioner and his counsel, to issue the writ of error coram nobis. Rather than witnesses to substantiate his latest charges, petitioner substitutes rhetoric for evidence, conjecture for fact. With the exception of Mrs. Erdman, who has died since the first coram nobis hearing, all others with knowledge of the facts touching upon his present claims were available to offer proof. However, instead of evidence, petitioner has been satisfied to rely upon dialectical projections and conclusory allegations. These are no substitute for proof. Certainly they do not warrant the vacatur of a judgment of conviction entered eight years ago after a trial at which petitioner, represented by able and experienced counsel, had a full and fair opportunity to defend himself. The Supreme Court has admonished that the extraordinary writ of error coram nobis should issue "only under circumstances compelling such action to

59. 289 F.Supp. at 271.

60. 289 F.Supp. at 272.

61. Affidavits were made available by the government to the defense prior to or at the trial and before the presentation of any evidence; e. g., SM 308.

62. 289 F.Supp. at 273.

63. Glasser v. United States, 315 U.S. 60, 88, 62 S.Ct. 457, 473, 86 L.Ed. 680 (1942) (Frankfurter, J., concurring).

achieve justice." [64] This is not such a case.

The application is denied in all respects and the petition dismissed.

---

**64.** United States v. Morgan, 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98 L.Ed. 248 (1954).